## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                          Case No. 21-cr-51 (DWF/TNL)

               Plaintiff,

v.                                                 **REPORT & RECOMMENDATION**

Edell Jackson,

               Defendant.

---

Thomas Calhoun-Lopez, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Daniel L. Gerdts, 331 Second Avenue South, Suite 705, Minneapolis, MN 55401 (for Defendant).

---

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Edell Jackson's Motion to Suppress Electronic Surveillance Evidence, ECF No. 22; Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures, ECF No. 23; and Motion to Suppress Statements Made by Defendant, ECF No. 24. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on June 4, 2021. ECF No. 29. Assistant United States Attorney Thomas Calhoun-Lopez appeared on behalf of the United States of America (the

1

"Government"). Attorney Daniel L. Gerdts appeared on behalf of Defendant. Post-hearing

briefing is now complete, and this motion is ripe for a determination by the Court.

## II. FINDINGS

The Court heard testimony from Officer Kate Deering of the Brooklyn Center Police

Department. The Government offered and the Court received Government Exhibit 1, the

application, search warrant, and receipt, inventory and return for the search of a white 2006

Chevrolet Avalanche ("Avalanche Warrant"); Exhibit 2, the application, search warrant,

and receipt, inventory and return of a cell phone ("Cell Phone Warrant"); Exhibit 3, an

audio recording of a call placed by Defendant from the Hennepin County jail; and Exhibit

4, an e-mail regarding telephone procedures at the Douglas County jail. Based upon the

file and documents contained therein, along with the testimony and exhibits presented, the

undersigned Magistrate Judge makes the following findings.

### A. January 14, 2021 Dispatch & Apprehension of Defendant

Officer Deering is "currently assigned to the patrol division and answer[s] 9-1-1

calls and calls for service." Tr. 17:25-18:1, ECF No. 33.[1]  On January 14, 2021, Officer

Deering was dispatched to a "report of shots heard" and "a subsequent domestic." Tr.

18:16-19; *see* Tr. 35:16-36:4. On her way to the scene, Officer Deering received additional

information from dispatch. Tr. 19:5-17. Dispatch indicated that "the reporting party[,

A.L.W.,] was involved in a domestic with a male . . . identified in the call as Edell Jackson."

Tr. 19:11-21. A.L.W. reported being "beaten and shot at with a revolver," although the

---

[1] The Court notes that, although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due June 25, 2021, and no such notice was filed. ECF No. 33.

shot did not hit her. Tr. 19:13-17. A.L.W. was traveling to another location to meet with law enforcement. Tr. 19:13-15; *see* Tr. 36:12-14.

Officer Deering went to meet with A.L.W. Tr. 19:24-20:4. Officer Deering met with A.L.W. "just south of Brooklyn Center," in the "area of 44th Avenue North and Lyndale Avenue North in Minneapolis." Tr. 20:15-19; *see* Tr. 36:15-18. A.L.W. told Officer Deering that she was romantically involved with Defendant for approximately three months, "since October 2020." Tr. 21:6-10. That day, A.L.W. brought Defendant to the residence of a family member in Brooklyn Center. Tr. 20:22-24. While at the residence, A.L.W. and Defendant "got into an argument about money." Tr. 20:24-25. "[T]he argument turned into a physical fight," and A.L.W. "was punched several times in the arms, torso, . . . head[,] and face." Tr. 20:25-21:2. At one point, A.L.W. fell to the ground and Defendant "started kicking her." Tr. 21:13-15. "[T]he fight escalated further in that [Defendant] pulled out a revolver and shot at [A.L.W.]" while she was getting up. Tr. 21:2-4, 11-15; *see* Tr. 36:24-37:3. The shot "almost hit [A.L.W.'s] foot but missed." Tr. 21:2-5. Both A.L.W. and Defendant then left the residence. Tr. 21:2-5.

When Officer Deering approached A.L.W., she noticed a facial tissue or piece of toilet paper with "a significant amount of blood on it." Tr. 21:19-22. A.L.W. was also holding a facial tissue or piece of toilet paper "up to her nose as it was still bleeding." Tr. 21:22-23. Officer Deering further noticed "scratches on [A.L.W.'s] left arm and biceps area." Tr. 21:23-24. Additionally, A.L.W. was wearing glasses. Tr. 21:25. A.L.W. explained that she had been wearing her contacts, "but she was punched so hard that they came out." Tr. 22:4-8. A.L.W. was also in pain; "her head hurt and . . . her nose was

numb." Tr. 22:1-3.

Defendant and A.L.W.'s cell phones were set up in a way that allowed for location sharing. *See* Tr. 22:9-23:16. Through an application on her cell phone, A.L.W. was able to see the location of Defendant's cell phone. Tr. 22:12-15, 23:15-16; *see* Tr. 37:11-38:4. A.L.W. sent Officer Deering a screenshot of where the application on her cell phone showed Defendant's cell phone to be located. Tr. 23:2-3; *see* Tr. 38:1-7. The application showed Defendant's cell phone in "[t]he area of 40th and Lyndale Avenue North," approximately five blocks southeast of Officer Deering and A.L.W. Tr. 23:23-24:1. A.L.W. also showed Officer Deering a photograph of Defendant's vehicle—a white Avalanche—including the license plate. Tr. 22:16-18. Officer Deering relayed this information to other law enforcement officers. Tr. 24:2-4.

Based on her interview with A.L.W., Officer Deering further learned that Defendant had threatened A.L.W. in the past, "[t]hreatened her with a weapon and ha[d] used a weapon against her"; "choked [A.L.W.] in the past"; was "a Gangster Disciple"; was not currently employed but sold drugs; and had a warrant "for his arrest for fleeing police in a motor vehicle." Tr. 24:20-25:2. A.L.W. also told Officer Deering that Defendant had two firearms with him that day, "one a revolver and one a 9 millimeter." Tr. 25:3-7; *see* Tr. 41:20-22.

Other law enforcement officers confirmed that there was a felony warrant out for Defendant's arrest for fleeing police in a motor vehicle and went to check the area where A.L.W.'s cell phone showed Defendant's cell phone to be. Tr. 25:8-26:6. They located a vehicle matching the picture A.L.W. showed Officer Deering in the area. Tr. 25:24-26:8;

*see* Tr. 38:13-15.

Additional law enforcement agencies were brought in due to Defendant's criminal history, the firearms, and his history of fleeing.  Tr. 26:10-24.  The vehicle was in a parking lot.  Avalanche Warrant App. at 2.[2]  "[I]t appeared to be occupied and the tail lights were on."  Avalanche Warrant App. at 2.  Law enforcement "observed as a male went in to the apartment building and came out minutes later."  Avalanche Warrant App. at 2.  "When the male got back in the vehicle, [law enforcement o]fficers drove in to [sic] the lot to arrest the male."  Avalanche Warrant App. at 2

Law enforcement officers first approached the vehicle with a marked squad, activating the emergency lights and shining a spotlight into Defendant's vehicle.  Tr. 26:25-27:8, 18-23.  Defendant "backed up," "attempted to flee," and "got stuck in a snowbank."  Tr. 27:10-11; *see* Avalanche Warrant App. at 2 ("[Defendant] immediately put the vehicle in reverse and drove in to [sic] a snowbank.").  The marked squad "tapped the front bumper in order to get the vehicle stopped and push it further into the snowbank to disable it."  Tr. 27:11-14.

Defendant then "put the vehicle into drive and attempted to drive out of the snowbank."  Tr. 27:14-15.  Another law enforcement officer in an unmarked vehicle drove up "to the driver's side and hit the driver's side of the vehicle in order to further disable it."  Tr. 27:16-17, 28:3-5; *see* Avalanche Warrant App. at 2 (law enforcement "was able to pin [Defendant's] vehicle with . . . [a] squad car").  Defendant continued to "[a]ttempt[] to

---

[2] For ease of reference, the Court uses the pagination of the individual "components" of the search warrant.

drive out of the snowbank."  Tr. 28:6-11.

Law enforcement officers got out of their vehicles and "gave several commands to [Defendant] to put his hands up."  Tr. 28:12-17, 22-23.  Defendant did not comply.  Tr. 28:24-25.  Rather, Defendant exited the vehicle through the passenger side, took off his jacket[3], threw the jacket on the ground, and began running through the parking lot.  Tr. 29:1-9, 14-16; *see* Avalanche Warrant App. at 2 ("[Defendant] then exited the vehicle out the passenger door and fled on foot.  When fleeing on foot, [Defendant] dropped a jacket.").  Defendant was also tased while getting out of the vehicle.  Tr. 39:10-15.  Law enforcement officers gave chase and apprehended Defendant.  Tr. 29:10-13, 18-19.

Officer Deering arrived on the scene approximately five to ten minutes after Defendant had been apprehended.  Tr. 29:25-30:2, 39:24-40:5.  Officer Deering went over to Defendant's jacket, which was "approximately 10 to 15 feet" from the vehicle.  Tr. 30:5-7; *see* Tr. 40:8-10.  Officer Deering noticed "[t]he imprint of a [firearm] magazine" as the jacket lay on the ground.  Tr. 30:13-17.  Among other things, Officer Deering recovered a loaded firearm from the jacket with a round in the chamber along with "a paper copy of a Minnesota driver's license with [Defendant's] name on it."  Tr. 30:23-31:6, 15-19; *see* Tr. 31:13-22, 40:23-41:8; *see also* Avalanche Warrant App. at 3 ("Officers checked the jacket that [Defendant] dropped and located a gun.").

**B. Search of the Vehicle**

The vehicle was ultimately towed since it had been disabled by both being stuck in

---

[3] This piece of outerwear has been referred to as both a "coat" and a "jacket."  *See, e.g.*, Tr. 29:7-9 (coat); Avalanche Warrant App. at 2 (jacket); Cell Phone Warrant App. at 2 (jacket).

the snowbank and law enforcement's efforts to stop it as well as "for further evidence" in light of A.L.W.'s report that Defendant had two firearms. Tr. 32:2-14. Law enforcement obtained a warrant to search the vehicle. Tr. 32:15-21; *see generally* Avalanche Warrant.

The application for the Avalanche Warrant recounted the day's events, including that (1) law enforcement had responded to an alleged domestic assault, in which Defendant pulled out a revolver and shot one round at A.L.W.; (2) A.L.W. reported that Defendant left in a white Avalanche and had two firearms with him; (3) A.L.W. was able to track the location of Defendant's cell phone through a "share[d] . . . cell phone plan"; (4) the Avalanche had been located in that area; (5) Defendant attempted to flee law enforcement both in his vehicle and on foot; (6) Defendant dropped a jacket while fleeing on foot and a firearm was found in the jacket; (7) Defendant "has several felony convictions that prohibit[] him from possessing firearms"; and (8) Defendant had an active felony warrant for fleeing a police officer in a motor vehicle. Avalanche Warrant App. at 2-3. The application sought to seize the following from the vehicle: "[f]irearms"; "[h]andgun magazines"; "[a]mmunition"; "[f]irearm boxes, parts, or accessories"; "[a]ny cell phones belonging to [Defendant]"; and "[d]ocuments demonstrating constructive possession of the vehicle." Avalanche Warrant App. at 1. Additionally, the application sought "[a]uthority to take photographs of the vehicle and property inside the vehicle." Avalanche Warrant App. at 1. A cell phone and vehicle documentation with Defendant's name on it were recovered during the search. Avalanche Warrant Receipt at 1; Tr. 33:10-15.

### C. Search of the Cell Phone

The cell phone was found "on the driver's floorboard" of Defendant's vehicle. Cell

Phone Warrant App. at 3. A warrant was obtained to search it. Tr. 33:16-18; *see generally* Cell Phone Warrant. Like the Avalanche Warrant, the application for the Cell Phone Warrant recounted the day's events. Cell Phone Warrant App. at 2-3. The application also stated that, "[d]uring a search of the Chevrolet Avalanche, a . . . [cell phone] was located on the driver's floor board. It was believed to belong to [Defendant] and was confirmed after [A.L.W.] provided [Defendant's] passcode for the phone." Cell Phone Warrant App. at 3. The application further stated "that [Defendant] and [A.L.W.] had phone communication before [A.L.W.] provided [Defendant] with a ride to the location where the assault occurred," and "that the revolver that was allegedly used in the assault was not located and that [Defendant] was in the apartment building for several minutes before being arrested." Cell Phone Warrant App. at 3. The application sought electronic data relating to the alleged assault, and explained that the requested data "could provide evidence to the events leading up to the assault and the possible location of the revolver." Cell Phone Warrant App. at 3; *see* Cell Phone Warrant App. at 1.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

### A. Motion to Suppress Electronic Surveillance Evidence

This motion concerns "more than 40 telephone calls [intercepted and recorded by the Government] in which Defendant . . . was a participant." ECF No. 22 at 1. Based on the record before the Court, these calls consist of calls placed while Defendant was detained at the Hennepin and Douglas County jails. *See* Gov't Exs. 3 (audio recording of call placed

from Hennepin County jail), 4 (e-mail regarding telephone procedures at Douglas County jail); *see also* Gov't Omnibus Resp. at 3 ("The only interception of communication of which the [Government] is aware is the recording of . . . Defendant's jail calls, which is done automatically at the facility for every inmate."), ECF No. 27; Def.'s Mem. in Supp. at 2-3 (discussing calls placed from Hennepin and Douglas County jails), ECF No. 34.

Defendant "concedes that the Government has met its burden of proof with respect to recorded calls from the Hennepin County jail in which Defendant was a participant," in light of the advisory that the call was subject to recording and monitoring. Def.'s Mem. in Supp. at 2. Such advisory was in fact given multiple times during the call at Government Exhibit 3. *See, e.g.*, Gov't Ex. 3 at 0:57-59, 1:26-28, 3:44-46.

As for any calls from the Douglas County jail, Defendant argues that the e-mail contained at Government Exhibit 4 is insufficient to meet the Government's burden to show that Defendant consented to the interception of his calls while at the facility. Defendant additionally asserts that "[i]t may also be the case that no such recordings exist at all, and that the Government has no intention of introducing such a call – a question that Defendant will reserve for the Government's responsive memorandum." Def.'s Mem. in Supp. at 3. Defendant noted that he "ha[d] not received any such calls in discovery." Def.'s Mem. in Supp. at 3. In response, the Government states that it "does not intend to offer any calls [Defendant] placed from the Douglas County [j]ail in its case-in-chief." Gov't Resp. at 13, ECF No. 35.

Based on the foregoing, the Court recommends that this motion be denied as moot.

## B. Motion to Suppress Evidence Obtained From Unlawful Searches and Seizures

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting U.S. Const. amend. IV). "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). Defendant challenges the seizure of his person and vehicle on January 14 and the subsequent searches of his vehicle and cell phone.[4]

### 1. Seizure of Defendant & the Vehicle

"A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146,

---

[4] As best as this Court is able to tell, it does not appear that Defendant challenges the search of the discarded jacket outside of the lawfulness of the seizure on January 14. *See* Def.'s Mem. in Supp. at 3-6; *see generally* ECF No. 23.

In any event, Defendant abandoned the jacket when he discarded it while attempting to flee law enforcement. "It is well-established that a defendant does not have a reasonable expectation of privacy in abandoned property." *United States v. Crumble*, 878 F.3d 656, 659 (8th Cir. 2018); *see United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (per curiam) ("The Fourth Amendment is not implicated by a search of property that has been abandoned because a defendant who has abandoned his property has relinquished his reasonable expectation of privacy." (quotation omitted)). "A finding of abandonment depends on the totality of the circumstances, with two important factors being denial of ownership and physical relinquishment of the property." *Crumble*, 878 F.3d at 659 (quotation omitted); *accord Nowak*, 825 F.3d at 948. "Whether property has been abandoned is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Nowak*, 825 F.3d at 948. Defendant physically relinquished the jacket when he fled from his vehicle while officers were attempting to arrest him. *See id.*; *see also United States v. Edwards*, 563 F. Supp. 2d 977, 1003 (D. Minn. 2008). "The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." *United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994) (quotation omitted); *see Edwards*, 563 F. Supp. 2d at 1003-04. There is no indication that Defendant attempted to retrieve the jacket. Based on the totality of the circumstances, the Court concludes that the jacket was abandoned. *See, e.g.*, *Crumble*, 878 F.3d at 659-60; *Nowak*, 825 F.3d at 948-49; *United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006); *Edwards*, 563 F. Supp. 2d at 1003-04; *see also California v. Hodari D.*, 499 U.S. 621, 629 (1991).

152 (2004)); *see also Draper v. United States*, 358 U.S. 307, 310 (1959) ("The crucial question for us then is whether knowledge of the related facts and circumstances gave [law enforcement] probable cause within the meaning of the Fourth Amendment . . . to believe that petitioner had committed or was committing a violation of the narcotics laws." (quotation and footnote omitted)).

"Probable cause is a practical and common-sensical standard that is based on the totality of the circumstances and requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quotation omitted).  It is assessed "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case." *United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) (quotation omitted); *see also, e.g.*, *United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995) ("Probable cause exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense.").  "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted).

In the end, "[p]robable cause 'is not a high bar.'" *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Illinois v. Gates*,

11

462 U.S. 213, 243-244, n.13 (1983)).  "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest."  *Winarske*, 715 F.3d at 1067.

### a.    Probable Cause for the Alleged Assault

Defendant does not quarrel that there was probable cause to believe that a crime had been committed at the time of his seizure.  *See* Def.'s Mem. in Supp. at 3-4 ("As for whether the police had sufficient probable cause to believe that a crime had been committed, the evidence was certainly sufficient . . . .").  Rather, Defendant argues that law enforcement "did not have probable cause to believe that the person they were seizing was the person who had committed the crime, or that it was even Defendant."  Def.'s Mem. in Supp. at 4. Defendant argues that the location information provided by A.L.W. was "not an active tracking signal that police could use to follow the [cell] phone," but a "snapshot in time" as to the phone's location, and "[a]t no time did anybody appear to ask about, share, or discuss any information regarding a description of Defendant."  Def.'s Mem. in Supp. at 4-5.  According to Defendant, "there is absolutely nothing in this record to establish that the police had probable cause to seize the unidentified 'male' who walked from the unknown apartment building to the vehicle."  Def.'s Mem. in Supp. at 5-6.

The Court concludes that a reasonably prudent police officer having knowledge of the circumstances of the alleged assault of A.L.W., the description of the alleged perpetrator's vehicle, and the location of the alleged perpetrator's cell phone would believe that the male inside the white Avalanche with the matching license plate had committed

12

the alleged assault of A.L.W and that evidence of the alleged assault would be found in the vehicle. It is true, as Defendant points out, that the record does not reflect a discussion and comparison of Defendant's physical characteristics with the male in the white Avalanche. But, A.L.W. provided law enforcement with information regarding the model (Avalanche), color (white), and license plate of Defendant's vehicle. Through the location-sharing application A.L.W. and Defendant used, A.L.W. was able to show law enforcement where Defendant's cell phone was located. Law enforcement proceeded to that area and located a vehicle matching the description of Defendant's vehicle with a male inside. *Cf. United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) ("Even if nobody knew for sure whether the robber *actually* possessed a cell phone, the judges were not required to check their common sense at the door and ignore the fact that most people 'compulsively carry cell phones with them all the time.'" (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018)). Law enforcement observed the male exit the vehicle, enter the apartment building, and return to the vehicle a short time later. Under the totality of the circumstances, a reasonably prudent police officer would believe that the male at this location in the white Avalanche with the matching license plate had committed the alleged assault of A.L.W., and evidence of that assault—including but not limited to the firearm used—would be found in the vehicle.[5]

---

[5] *See infra* n.6.

### b.    Probable Cause for Fleeing a Peace Officer

Moreover, even assuming for sake of argument that law enforcement did not have probable cause to seize "the male" when they first approached the vehicle, Defendant's flight from law enforcement "furnished independent grounds for [his] arrest." *Flores-Lagonas*, 993 F.3d at 560.   As the Government points out, the Eighth Circuit Court of Appeals has "consistently held that a defendant's response to an arrest or *Terry* stop—even an invalid one—may constitute independent grounds for arrest." *Id.* (citing cases).   It is undisputed that Defendant attempted to flee from law enforcement both in his vehicle and on foot, each of which is a crime under Minnesota law.

First, Defendant attempted to flee from law enforcement by driving away after a marked squad approached his vehicle with its emergency lights flashing and a spotlight shining at Defendant's vehicle. *See id.* at 560-61.   Under Minnesota law, "[w]hoever by means of a motor vehicle flees or attempts to flee a peace officer who is acting in the lawful discharge of an official duty, and the perpetrator knows or should reasonably know the same to be a peace officer, is guilty of a felony . . . ."  Minn. Stat. § 609.487, subd. 3; *see* Minn. Stat. § 609.487, subd. 1 (defining "flee" as "to increase speed, extinguish motor vehicle headlights or taillights, refuse to stop the vehicle, or use other means with intent to attempt to elude a peace officer following a signal given by any peace officer to the driver of a motor vehicle").

Second, once the vehicle was disabled, Defendant exited through the passenger side and attempted to flee on foot.   Under Minnesota law, "[w]hoever, for the purpose of avoiding arrest, detention, or investigation, or in order to conceal or destroy potential

14

evidence related to the commission of a crime, attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running, hiding, or by any other means except fleeing in a motor vehicle, is guilty of a misdemeanor."  Minn. Stat. § 609.487, subd. 6.

Accordingly, Defendant's flight provided an independent basis to arrest him. *Flores-Lagonas*, 993 F.3d at 560-61.

## 2. Searches Pursuant to Warrants

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend IV; *see, e.g.*, *United States v. Mayweather*, 993 F.3d 1035, 1040 (8th Cir. 2021) ("The Fourth Amendment requires that warrants to search be supported by probable cause.").  "A supporting affidavit establishes probable cause to issue a search warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched."  *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quotation omitted); *see United States v. Skarda*, 845 F.3d 370, 376 (8th Cir. 2016) ("A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." (quotation omitted)); *see also Gates*, 462 U.S. at 238 ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

"The court must make a 'common-sense decision' based on the totality of the

circumstances set forth in the affidavit as to whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Gates*, 462 U.S. at 238); *see Davis*, 867 F.3d at 1027 ("The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." (quotation omitted)).  "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . [the Eighth Circuit has] also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *Brackett*, 846 F.3d at 992 (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)); *accord United States v. Augard*, 954 F.3d 1090, 1094 (8th Cir. 2020).  "Factors to consider in determining whether a warrant application sufficiently links the items to be seized with the place to be searched include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020) (quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

"When an issuing court relies solely on an affidavit to determine whether probable cause exists, th[e reviewing] court only looks to the information found within the four corners of the affidavit." *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) (quotation omitted).  "Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference." *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *2 (D. Minn. Mar. 14, 2011), *report and recommendation adopted*, 2011 WL 1060981 (D. Minn.

Mar. 23, 2011); *see also, e.g.*, *Evans*, 4 F.4th at 636; *Mayweather*, 993 F.3d at 1041; *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020); *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016).

Defendant challenges the warrants to search his vehicle and cell phone. The Court considers each in turn.

### a.    Vehicle

Defendant argues that the Avalanche Warrant was not supported by probable cause because the affidavit did not provide "any reason to believe that evidence of a crime or contraband would be found in the vehicle."[6] Def.'s Mem. in Supp. at 7. According to Defendant, the affidavit did not "even suggest a reason or provide a hunch about why anything of evidentiary interest would be found in the vehicle." Def.'s Mem. in Supp. at 7.

As stated above, the application for the Avalanche Warrant recounted the events of January 14, including that (1) law enforcement had responded to an alleged domestic assault, in which Defendant pulled out a revolver and shot one round at A.L.W.; (2) A.L.W. reported that Defendant left in a white Avalanche and had two firearms with him; (3)

---

[6] The parties have argued the constitutionality of the search of Defendant's vehicle in terms of whether the Avalanche Warrant was supported by probable cause, and so the Court proceeds in that fashion.

Arguably, no warrant was needed for the search. "Under the 'automobile exception' to the Fourth Amendment, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Winarske*, 715 F.3d at 1068; *see also United States v. Dunn*, 928 F.3d 688, 693 (8th Cir. 2019). "Probable cause for a search under the automobile exception exists if the facts and circumstances known to the officers when they began the search were sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle." *Walker*, 840 F.3d at 483. The same facts and circumstances supplying probable cause for the warrantless arrest of Defendant and seizure of his vehicle, *see supra* Section III.B.1.a, provided probable cause to believe that the vehicle contained evidence of the alleged assault. *See Winarske*, 715 F.3d at 1068.

A.L.W. was able to track the location of Defendant's cell phone through a "share[d] cell phone plan"; (4) the Avalanche had been located in that area; (5) Defendant attempted to flee law enforcement both in his vehicle and on foot; (6) Defendant dropped a jacket while fleeing on foot and a firearm was found in the jacket; (7) Defendant "has several felony convictions that prohibit[] him from possessing firearms"; and (8) Defendant had an active felony warrant for fleeing a police officer in a motor vehicle.  Avalanche Warrant App. at 2-3.

The application for the Avalanche Warrant therefore described how Defendant had two firearms with him on the day he allegedly assaulted A.L.W., one of which was used in the alleged assault; Defendant was located in the area where his cell phone was shown to be in the subject vehicle, which matched the description provided by A.L.W.; and only one of the firearms was recovered after Defendant attempted to flee from law enforcement both in his vehicle and on foot.  Based on these facts, the application sought to seize, among other things, firearms and related paraphernalia (such as magazines and ammunition) as well as "[d]ocuments demonstrating constructive possession of the vehicle."  Avalanche Warrant App. at 1.  The affidavit set forth sufficient facts establishing a nexus between these items and the vehicle and it is plainly reasonable to infer that such items could be found in the vehicle.  Under the totality of the circumstances, the Court concludes that the application for the Avalanche Warrant established a fair probability that evidence of criminal activity, including the alleged assault and illegal possession of firearms, would be found in the vehicle, and therefore established probable cause for the issuance of the search warrant.

### b. Cell Phone

As for the search of his cell phone, "Defendant contests this search primarily for the reason that the entire factual basis for probable cause submitted in the affidavit in support of the [Cell Phone Warrant] was derived from previous searches and seizures that were constitutionally infirm." Def.'s Mem. in Supp. at 8. The Court has concluded that the arrest of Defendant, seizure of his vehicle, and subsequent search of his vehicle were all supported by probable cause. *See supra* Sections III.B.1, 2.a. These facts along with other facts connecting the cell phone to Defendant and the alleged assault (including communication between Defendant and A.L.W. by phone prior to A.L.W. giving Defendant a ride to the location where the alleged assault occurred and the discovery of the cell phone on the driver's floorboard of Defendant's vehicle) were set forth in the application for the Cell Phone Warrant. The facts in the application established a fair probability that evidence of the alleged assault would be found in the cell phone's electronic data, and therefore established probable cause for the issuance of the Cell Phone Warrant.

Defendant also takes issue with that portion of the Cell Phone Warrant application indicating that law enforcement confirmed the cell phone belonged to Defendant with the assistance of A.L.W., who provided Defendant's passcode, which presumably successfully unlocked the cell phone. Defendant interprets this to mean that "the officers found [the cell] phone in the vehicle, then asked Defendant's girlfriend if she knew the passcode, [and] then used the passcode to conduct a search of the device by opening it *before* seeking a warrant." Def.'s Mem. in Supp. at 8; *see* ECF No. 23 at 2. According to Defendant, "this

19

case is the unusual situation in which the affidavit in support of the warrant clearly recites that the request is based in part on an unlawful search." Def.'s Mem. in Supp. at 8. Defendant argues that law enforcement "used the fruit of the clearly unlawful search to support the[] factual basis for believing that the [cell] phone belonged to Defendant," and "no objectively reasonable police officer could possibly believe that a warrant that is based on a clearly unlawful search could itself be lawful." Def.'s Mem. in Supp. at 8-9.

The Government responds that Defendant's interpretation "is an overly broad reading of [that] sentence, requiring speculation and conjecture." Gov't's Resp. at 12. The Government asserts that "[t]here is no basis to conclude that officers searched [Defendant's cell] phone before [obtaining] the warrant. Rather, it appears that officers entered the passcode [A.L.W.] provided into the [cell] phone to see what effect it would have[;] when the passcode was accepted, they noted in the affidavit that the passcode had been verified." Gov't's Resp. at 12. Acknowledging that "[t]his is perhaps not a best practice," the Government asserts "there is no indication that officer[s] accessed content in the [cell] phone itself." Gov't's Resp. at 12.

At bottom, Defendant's argument is that evidence seized pursuant to the Cell Phone Warrant must be suppressed because the application was improperly based on "a search of the device by opening it" before the warrant was obtained. Defendant has not articulated how the mere entry of the supplied passcode into his cell phone constituted a search within the meaning of the Fourth Amendment. Nor has he presented any authority in support of

such an argument.  Accordingly, Defendant has not met his burden on this issue.[7]  *See United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) ("[T]he defendant bears the burden of proving whether and when the Fourth Amendment was implicated." (quotation omitted)); *United States v. Kouayara*, 189 F. Supp. 3d 835, 840 (D. Minn. 2016) ("The proponent of a motion to suppress evidence on the basis of a Fourth Amendment violation 'has the burden of establishing that his . . . Fourth Amendment rights were violated by the challenged search or seizure.'" (alteration in original) (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978)); *see also Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search."  (citation omitted)); *United States v. Golden*, 418 F. Supp. 3d 416, 418, 421 (D. Minn. 2019) (same).

## C.  Motion to Suppress Statements Made by Defendant

This motion concerned a statement made by Defendant in response to a "law enforcement interrogation . . . when he was in police custody."  ECF No. 24 at 1.  Although the Government produced a recording of that statement, there was a technical issue and defense counsel was unable to review it prior to the filing of the motion.  *See* ECF No. 24 at 1.

---

[7] Notwithstanding this legal conclusion, the Court wholeheartedly echoes the Government's observation that what occurred in this case is not a preferred practice.  That being said, the Court additionally notes that there is no evidence in the record suggesting or any basis upon which it could be reasonably inferred that the events in question constitute the sort of police conduct targeted by the exclusionary rule.  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring v. United States*, 555 U.S. 135, 144 (2009); *accord Davis v. United States*, 564 U.S. 229, 240 (2011); *see United States v. Szczerba*, 897 F.3d 929, 937-38 (8th Cir. 2018).  "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," *Herring*, 555 U.S. at 144, not "to suppress evidence obtained as a result of nonculpable, innocent police conduct," *Davis*, 564 U.S. at 240; *see Szczerba*, 897 F.3d at 938.

At the hearing, defense counsel informed the Court that "a working copy of the statement" had been received.  Tr. 15:10-12.  The Government also confirmed that it did "not intend to offer any of Defendant's statements in its case-in-chief."  Gov't's Omnibus Resp. at 6; *see* Tr. 15:10-15, 15:24-16:2.  Accordingly, the parties agree that this motion is moot.  Tr. 15:10-15; Gov't's Omnibus Resp. at 6.

[Continued on next page.]

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Electronic Surveillance, ECF No. 22, be **DENIED** as moot.

2. Defendant's Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures, ECF No. 23, be **DENIED**.

3. Defendant's Motion to Suppress Statements Made by Defendant, ECF No. 24, be **DENIED** as moot.

Date: August___25___, 2021                              _____*s/ Tony N. Leung*_____
                                                        Tony N. Leung
                                                        United States Magistrate Judge
                                                        District of Minnesota

                                                        *United States v. Jackson*
                                                        Case No. 21-cr-51 (DWF/TNL)

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.