UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-051 (DWF/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **TRIAL BRIEF** |
| v. | ) | **OF THE** |
| | ) | **UNITED STATES** |
| EDELL JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America by and through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Assistant United States Attorneys Thomas Calhoun-Lopez and Angela M. Muñoz, respectfully submits its trial brief in the above-captioned case.

## I.   <u>INDICTMENT.</u>

Jackson is charged with one count of possession of a firearm as an armed career criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

## II.   <u>TRIAL COUNSEL.</u>

The United States will be represented by the following counsel:

Assistant United States Attorney Thomas Calhoun-Lopez
thomas.calhoun-lopez@usdoj.gov
Desk:  612-664-5659   /   Cell:  612-388-2181

Assistant United States Attorney Angela M. Muñoz
angela.munoz@usdoj.gov
Desk: 612-664-5779   /   Cell:  612-508-9732

III.   **SUMMARY OF THE EVIDENCE AT TRIAL.**

The United States anticipates the evidence at trial will prove the following facts:

      a.    *The Arrest of Jackson and Recovery of the Firearm.*

On the afternoon of January 14, 2021, officers of the Brooklyn Center Police Department were dispatched to a call of shots fired. An officer met with a woman with the initials A.L.W., who said that Edell Jackson had shot at her during an argument, and that he was armed.[1] A.L.W. and Jackson shared a phone plan, and A.L.W. was able to determine the location of Jackson's phone, which she provided to officers: the rear parking lot of an apartment building in the 4100 block of Lyndale Avenue North. Officers also determined that Jackson had an unrelated warrant for his arrest.

Officers found Jackson in the parking lot, in the driver's seat of a Chevrolet Avalanche. He was the sole occupant of the vehicle. They were joined by deputies of the Hennepin County Sheriff's Office and officers of the Minneapolis Police Department. The officers and deputies coordinated to make the arrest. They approached in marked and unmarked vehicles, with emergency lights flashing. Jackson made eye-contact with a uniformed officer in a marked police vehicle, then immediately put the vehicle into reverse and

---

[1] The United States intends to offer this information to provide necessary context and basis for responding officers to take the actions they did. The United States has filed a motion in limine. *See* § IVa, *infra*.

tried to drive away. Officers made contact with Jacksons' vehicle with their own vehicles to attempt to disable Jackson's vehicle, and to prevent Jackson from fleeing the driver's side door on foot.[2] Jackson continued to try to maneuver his vehicle away from the officers.

A uniformed officer approached Jackson with the officer's firearm drawn, ordering Jackson to show his hands.   Jackson moved to the passenger seat (the driver's door now pinned shut by a police vehicle), and ran from the vehicle.   As he ran, Jackson took his jacket off and discarded it in a snowbank near his vehicle.   He then ran past law enforcement officers, who gave chase. Jackson was eventually apprehended.[3]

---

[2] *See* § IVa, *infra*.

[3] Officers had to use tasers and physical strikes to apprehend and subdue Jackson.   They did so based on his criminal history and the violence involved in the underlying assault.   The United States does not intend to elicit either the actions taken to subdue Jackson after he fled the vehicle, or the underlying reasons for doing so.   The United States has moved in limine for an order precluding Jackson from eliciting testimony of the physicality of the arrest.   *See* § IVb, *infra*.



Fig. 1: a still frame from a pursuing officer's body-worn camera.   Jackson can be seen discarding his jacket as he flees from his vehicle.

Officers searched Jackson's jacket, and found in a zipped pocket a Bersa model Thunder 9mm semi-automatic pistol bearing serial number E17838. In another pocket, officers found Jackson's temporary driver's license.[4]



Fig. 2: Jackson's jacket on the snowbank where he discarded it.



Fig. 3: the firearm found in a zippered pocket.

---

[4] Along with the license was a bottle of pills. The United States does not intend to elicit testimony about this fact.

      b.    *The Search of Jackson's Cell Phone.*

A Brooklyn Center officer searched Jackson's vehicle pursuant to a state warrant. Inside, he found an Apple iPhone at the floor of the driver's seat. He searched that phone pursuant to another state warrant. The Apple ID of the phone was "Edell Jackson." The phone's Instagram page username was likewise "Edell Jackson," and included photographs of Jackson.

Officers found that on October 23, 2020, a text was sent from the phone with a photograph of the Bersa model Thunder 9mm semi-automatic pistol bearing serial number E17838—the firearm is identifiable by the serial number visible in the photograph. The photograph was accompanied with the words "I'm ready for whatever."[5] Also on the phone were numerous "selfie" style photographs of Jackson taken before and after the text was sent.

---

[5] The text was sent to A.L.W.  The contents of the phone, and other information known to law enforcement, suggest that Jackson and A.L.W. were involved in various illegal activities together. Also on the phone were multiple photographs of other firearms. The United States does not intend to elicit testimony regarding these other illegal activities, or the photographs of other firearms found on Jackson's phone. The United States does intend to argue that the text that Jackson is "ready for anything" suggests his possession of the charged firearm.



Fig. 4: a photograph of the charged firearm (identifiable by the serial number) sent from Jackson's iPhone.

c.    *DNA Analysis.*

The firearm was submitted to the Hennepin County Sheriff's Office for DNA analysis. The major DNA profile obtained from swabs from the firearm matched Jackson's DNA profile. The major DNA profile would not be expected to occur more than once among unrelated individuals in the world's population.

d.    *Jackson's Calls.*

Following his arrest, Jackson made recorded calls to A.L.W.[6]  In one call, Jackson tells A.L.W. why he was arrested, and tells her "You know what the

---

[6] These calls were made from the Hennepin County Jail.  The United States does not intend to elicit that the calls were made from jail; only that they were legally recorded calls that Jackson placed.   *See* § IVe, *infra*.

fuck was in my jacket. Come on now . . . same thing that was in your hand."
The United States intends to offer this call to show knowledge that the firearm
was in the pocket of his jacket when Jackson ran.

In another call, A.L.W. tells Jackson that she provided law enforcement
officers the passcode to Jackson's phone. Jackson immediately becomes upset,
and tells her "That might have buried me, though. You might have just killed
me now. You really just killed me, bro. I'm going federal." Later he tells her "I
know I'm fitting to go down. I'm going down before I gotta run. I don't know
what the fuck I'm going to do. I'm going down, though. I'm going down. I can't
believe you would do that to me, bro. Not that!" The United States intends to
offer this call to show consciousness of guilt, and knowledge that Jackson had
a photograph of the firearm on his phone.

    e.    *Felony Status and Interstate Nexus.*

The United States will offer testimony about Jackson's prior felony
convictions, and offer certified copies of his convictions.[7]

The firearm was submitted to an interstate nexus expert of the Bureau
of Alcohol, Tobacco, Firearms and Explosives (ATF). The firearm was
determined to have been manufactured in Argentina.[8]

---

[7] Jackson has declined to stipulate to his felony status, or his knowledge
of his prohibited status.   *See* § IVd, *infra*.

[8] Jackson has declined to stipulate to the interstate nexus of the firearm.

IV.   **EVIDENTIARY ISSUES.**

a.   *Background of Investigation as Necessary Context.*

As noted in § II.a, *supra*, the United States has moved in limine for a pretrial ruling allowing the United States to elicit the fact that A.L.W. stated that Jackson had shot at her, and that he was armed. (Document No. 49 at ¶ 1.) The United States does not intend to elicit any more evidence beyond that point on the January 14, 2021, investigation.

This evidence is necessary for the jury to understand the context of the subsequent arrest. Police officers initiated the arrest of Jackson in a decisive manner, and in a defensive posture, because they knew that Jackson was believed to be armed, and had recently discharged a firearm. That knowledge is necessary for the jury to understand why officers conducted the arrest in the manner that they did. In the absence of such information, the jury may erroneously assume that officers were being overly aggressive, especially in light of the Derek Chauvin trial and other local and national tragedies and controversies regarding the use of force employed by police officers.

Evidence to provide the context of a defendant's arrest is "clearly" admissible in felon-in-possession cases. *United States v. Savage*, 863 F.2d 595, 599–600 (8th Cir. 1988) (upholding admissibility of reference to robbery investigation in felon-in-possession case, and noting the government "was clearly entitled to give the context of the defendant's arrest and the subsequent search of

8

his automobile."). *See also United States v. Harris*, 956 F.2d 177, 180 (8th Cir. 1992) (upholding conviction where prosecution referred to police having "targeted [the defendant] for an unrelated crime," and finding that the comment was "relevant to explaining the basis for the police investigation" of the defendant.).

The facts in this case are analogous to *United States v. LaDue*, 561 F.3d 855 (8th Cir. 2009). In *LaDue*, a police officer was responding to a shots-fired call when he saw a man running across the street. 561 F.3d at 857. In affirming the admissibility of this fact, the Eighth Circuit held that the fact that shots had been fired "provided the jury with the proper context in which to understand [the officer's] actions," including the officer's decision to "leave his patrol car and pursue an unidentified man running across the street, and his decision to draw his service weapon." *Id*. The Eighth Circuit further noted that without "an understanding of the serious nature of the call to which [the officer] was responding, the jury could have been confused or misled by a seeming overreaction to a routine disturbance call." *Id*.

The same analysis applies in this case. Police officers undertook these arrests in a decisive and defensive posture because they knew that the defendant was a suspect in a shooting. Without this context, there is a significant danger that the jury will be confused or misled by a seeming overreaction on the part of police officers, particularly in light of local and national controversy regarding police use of force.

9

b.   *Inadmissibility of National Controversies and Facts of Arrest.*

The United States has moved in limine for an order precluding the Defendant or his counsel, in the presence of the jury, from introducing at trial (through testimony or argument) reference to national or local controversies regarding use of force by police officers, or allegations that excessive force was used in apprehending him in this case, absent a particularized showing that such an argument or line of inquiry is relevant. The evidence is irrelevant to the sole question with which the jury is charged: whether Jackson knowingly possessed the charged firearm. Given the understandably intense feelings of much of the public about this matter, it is likewise barred by Fed. R. Evid. 403.

"Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation." *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). A defendant may not put the government on trial by arguing that they have committed misconduct when, as here, he does not make any connection between the allegedly shoddy or slanted investigation and any evidence introduced at trial. *Id. See also United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994).

The only basis for admissibility of this type of evidence is if it casts doubt on or "undercuts" a piece of evidence admitted by the Government. *Id.* The

defendant must create a "requisite connection between the allegedly 'shoddy' or 'slanted' investigation and any evidence introduced at trial." *Id. See also United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) ("Merely showing that an investigation is sloppy does not establish relevance."); *United States v. Zaccaria*, 240 F.3d 75, 81 (1st Cir. 2001) ("In the absence of a particularized showing that the government was not turning square corners, the district court acted well within its discretion in refusing to let defense counsel embark on a fishing expedition.").

Even if the alleged police misconduct here had some minimal probative value, the evidence should be excluded under Fed. R. Evid. 403 because of the danger of unfair prejudice and jury confusion. *United States v. Patrick*, 240 F.3d at 23: "Such speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value." *See also Zaccaria*, 240 F.3d at 81 ("The substantial likelihood of unfair prejudice associated with this line of questioning, combined with the speculative nature of the appellant's bias theory, convinces us that foreclosing the inquiry entailed no abuse of discretion."); *McVeigh*, 153 F.3d at 1192 ("To have allowed McVeigh to put the government on trial because there might have been something more the government perhaps could have

done . . . would inevitably divert the jury's attention from the issues of the trial.").

If Jackson does believe that he has identified a basis for relevance, the United States requests that counsel for the United States and Jackson discuss any such testimony or argument with the Court in sidebar before it is offered or made.

      c.   *Admissibility of Impeachment of the Defendant.*

The United States has moved in limine for a pretrial ruling granting the United States permission to use Jackson's prior felony convictions for the limited purpose of impeaching his credibility if he elects to testify in this trial.

Where, as here, the credibility of a testifying defendant is a key consideration in the case, the United States may use a defendant's prior felony convictions to impeach his credibility. In this case, the United States anticipates that if Jackson chooses to testify, he will offer testimony that directly contradicts the testimony of other witnesses. Accordingly, credibility will be a key factor in this case.

Jackson's convictions are "highly probative of his credibility 'because of the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath.'" *United States v. Headbird*, 461 F.3d 1074, 1078 (8th Cir. 2006) (overruled on other grounds). The Eighth Circuit has approved the use of felony

convictions to impeach testifying defendants under Federal Rule of Evidence 609(a)(1)(B). *See, e.g.*, *United States v. El-Alamin*, 574 F.3d 915, 926 (8th Cir. 2009); *United States v. Jackson*, 310 F.3d 1053, 1054 (8th Cir. 2002); *United States v. DeVore*, 839 F.2d  1330, 1333 (8th Cir. 1987); *United States v. Jackson*, 696 F.2d 578, 589 (8th Cir. 1982); *United States v. Brown*, 956 F.2d 782, 787 (8th Cir. 1992); *United States v. Crawford*, 130 F.3d 1321, 1323 (8th Cir. 1997).

In affirming the district court's decision to admit proof of prior convictions for impeachment of testifying defendants, the Eighth Circuit has noted that the probative value of such impeachment evidence is particularly high where, as here, the jury will be asked to determine the credibility of competing stories by the defendant and the Government's witnesses. As the Court in *Headbird* stated: "Credibility was a key factor in the jury's consideration of the case. Defense and government witnesses presented contradictory testimony regarding possession of the firearm, and possession was the only contested element of the offense." 461 F.3d at 1078. Other Eighth Circuit cases confirm the probative nature of prior convictions for impeachment purposes where credibility is a central issue. *Crawford*, 130 F.3d at 1323 ("Credibility was at the heart of the jury's fact finding responsibility since possession was the critical issue. The probative value of the evidence was therefore significant. . . ."); *DeVore*, 839 F.2d at 1333 (the "[defendant's]

13

credibility as a witness was central to the jury's resolution . . ."); *Jackson*, 696 F.2d at 589 (noting that the probative value of the prior conviction "was further enhanced by the critical role that [defendant's] credibility would have played in this case if he had chosen to testify"); *Brown*, 956 F.2d at 787 (noting that because jury "had to choose between one version of the events presented by the government's witnesses and another version presented by defendant's," credibility was necessarily a "critical factor in jury's choice," and the defendant's prior burglary conviction was "highly probative" on the issue of credibility).

The United States respectfully requests the opportunity to cross-examine Jackson regarding his prior felony conviction should he testify. The United States intends to limit its cross-examination to the fact and nature of Jackson's prior offenses as approved by the Eighth Circuit in *Headbird*. 461 F.3d at 1078.

The United States contends that the following convictions are admissible pursuant to Fed. R. Evid. 609:

- 2nd Degree Drug Sale, St. Louis County, Minnesota, 69DU-CR-10-1331. Jackson was released from confinement within the last ten years (on May 30, 2017).

- 2nd Degree Drug Sale, St. Louis County, Minnesota, 69DU-CR-10-4149. Jackson was released from confinement within the last ten years (on November 10, 2016).

d.    *Certified Records of Convictions.*

As noted in § IIIe, *supra*, Jackson has declined to stipulate to his felony status.   The United States therefore intends to offer certified copies of two of his prior convictions, both from St. Louis County.[9] The United States will offer these exhibits as certified copies of public records. Pursuant to Fed. R. Evid. 803(8) and 902(4), the evidence self-authenticating and admissible unless the opponent shows that the source of information indicates a lack of trustworthiness.

The United States intends to include the sentence that Jackson received in both cases. The United States intends to include this information because, pursuant to *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the United States must establish that Jackson knew of his prohibited status; i.e., that at the time Jackson possessed the firearm, he knew he had been convicted of a crime punishable by imprisonment for more than one year. *See also* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 6.18.922A (2021). The United States intends to show that Jackson received sentences in both cases in excess of one year, and therefore had direct knowledge that he had been convicted of crimes that were punishable by imprisonment for more than one year.

The certified copies of convictions the United States intends to offer consist of the following:

---

[9] Jackson also has felony convictions from the State of Illinois. The United States does not intend to offer evidence of these convictions.

15

- 2nd Degree Drug Sale, St. Louis County, Minnesota, 69DU-CR-10-1331. Sentenced on August 16, 2011, to 78 months' imprisonment.

- 2nd Degree Drug Sale, St. Louis County, Minnesota, 69DU-CR-10-4149. Sentenced on August 8, 2012, to 144 months' imprisonment.

e.    *Certified Business Records—Jail Calls*.

As noted in § IIId, supra, the United States intends to offer brief portions of two calls Jackson made while in custody in the Hennepin County Jail following his arrest. As outlined in n.6, *supra*, these calls were made from the Hennepin County Jail. The United States does not intend to elicit that the calls were made from jail; only that they were legally recorded calls that Jackson placed.

The United States intends to offer these calls as certified business records pursuant to Fed. R. Evid. 803(6) and 902 (11). The United States is in possession of and has disclosed to Jackson certificates of authenticity from the Hennepin County Jail's custodian of records. Pursuant to Fed. R. Evid. 803(6) and 902(11), the evidence self-authenticating and admissible unless the opponent shows that the source of information indicates a lack of trustworthiness. The United States does not intend to call the custodian of records to authenticate this evidence.

f.    *Expert Testimony*.

The United States intends to offer testimony in the following areas:

1.    <u>DNA Testimony</u>.

The United States intends to Forensic Scientist Jessica Hansen of the Hennepin County Sheriff's Office Crime Laboratory, and Dr. Sunyoung Kim

16

Kleinedler, formerly of the Hennepin County Sheriff's Office Crime Laboratory. Ms. Hansen and Dr. Kleinedler determined that the major DNA profile on a swab from the charged firearm matches the DNA profile obtained from Jackson, and that this major profile would not be expected to occur more than once among unrelated individuals in the world's population.   In addition to the results of the DNA analysis, the United States will also offer evidence of the testing procedures, methodology, and science of DNA analysis.

      2.    <u>Latent Fingerprints</u>.

The United States intends to call Forensic Technician Sophia Leaf of the Hennepin County Sheriff's Office Crime Laboratory.  Ms. Leaf will testify that the firearm was processed for latent prints, but that no prints suitable for comparison were found.  She will testify to the procedures, methodology, and science of latent print examination and comparison, as well as factors that might preclude successful retrieval of latent prints on objects, particularly firearms.

      3.    <u>Conviction Fingerprints</u>.

In addition to the certified copies of Jackson's prior convictions, the United States intends to call Fingerprint Technician Emily Thiessen of the Bureau of Criminal Apprehension.   Ms. Thiessen would testify that she compared fingerprint records associated with Jackson's prior convictions to those in his instant arrest, and found them to match.

4.    <u>Cell Phone Extraction</u>.

The United States intends to call Detective Jeremy Whittenburg of the Anoka County Sheriff's Office.   Detective Whittenburg extracted data from Jackson's Apple iPhone.   He will testify to the technology he used to obtain photographs and texts found on the phone.

5.    <u>Interstate Nexus</u>.

The United States intends to call Special Agent Bryan Lervoog of the Bureau of Alcohol, Tobacco, Firearms and Explosives.   Special Agent Lervoog will testify that the Bersa model Thunder 9mm semi-automatic pistol bearing serial number E17838 was manufactured in Argentina, and necessarily traveled in interstate commerce to have arrived in Minnesota on January 14, 2021.

Dated:   February 17, 2022

Respectfully Submitted,

CHARLES J. KOVATS, JR.
Acting United States Attorney


*s/ Thomas Calhoun-Lopez*
BY: THOMAS CALHOUN-LOPEZ
Assistant U.S. Attorney
Attorney ID No. 480908DC